Is the appellant ready to proceed? Good morning, Your Honors. My name is Nate Kellum, and I represent the appellant Joshua Herridge, who comes to this court as the plaintiff and appellant seeking relief, relief from a policy that bars organized activities and specifically his leafletting, his sign-holding in a county public right-of-way. The relief that he seeks is warranted. This policy, this organized activities policy, is unconstitutional in its face and has applied to his benign religious expression. And Montgomery County is responsible for it and its enforcement, as is Officer Williams. The policy violates Mr. Herridge's right to free speech. It is undisputed that his speech, both the manner and the content, is constitutionally protected. It is also undisputed that the venue where he seeks to speak, this grassy cartilage that sits south of Lake Robbins Drive, spans 300, 400 feet, an entire block, is a traditional public forum. So the restriction on his protected speech in a traditional public forum must be narrowly tethered to meet a significant government interest. And this restriction does not. Montgomery County and Williams, they claim an interest in avoiding obstruction. And the glaring concern, the problem with this is that the restriction applies and it eliminates leafletting and sign holding, which do not cause obstruction. Mr. Herridge wants to stand in a grassy cartilage where he is out of the way of pedestrian traffic flow. So his presence cannot cause an obstruction. And the precedent is clear from the Supreme Court, United States versus Grace, United States versus Coquinda, Ward versus Rock against racism, in all these cases made clear that these type of activities, leafletting, sign holding, that they are not prone to cause a crowd to form. They are not prone to cause people to stop. They are not prone to cause obstruction. And so neither with his presence nor with his speech itself does it cause an obstruction. And what that presents is an obvious disconnect between the restriction, what the restriction does, and what it is purported to address. And for that reason — Let's stipulate that one person leafletting would not create a security risk. I'm not saying that that's true, but let's just stipulate for the purpose of argument. As I understand 4203, it contemplates the notion that there might be obstruction not just based on one person alone, but assuming that if he gets to speak, he gets a leaflet, then obviously others have the same First Amendment rights. So now you've got lots of people leafletting. What if we were to assume that one person is not enough, but 15 people would be a major problem? What would that do to your argument? A couple of things, Judge Hose. First of all, with 4203, it actually requires actual obstruction, not the potential aspect of it. But aside from that — Okay, but you would concede that if you've got an area where lots of people are obviously moving in and out of a big venue, one person may not be the biggest problem in the world, but 15 people could create a serious problem. Actually, I do not, Judge Hogan. I don't think that's what the cases say, that this aggregate-type argument really doesn't stand with leafletting because it's not an activity that if it's one person, it doesn't cause a stop. Neither will it if it's 15 people that it would cause a stop. You're saying as a practical matter, it doesn't matter how many people are there leafletting, there would be no obstruction? No, Your Honor. Not with this type of activity. There's absolutely no showing in law or fact that that would happen. I'm just thinking, like, when I go to a sports event or show or something, if everybody's walking in one direction, it's bad enough. When people are then going in multiple directions, it makes it harder to get out or in. Sure. Is that just true as a practical matter? Certainly. With this, you have a grassy curtilage that's beside a public sidewalk. So people could take a—and this is what's stated in the Supreme Court cases, and it seemed to also be contemplated by this court in Knowles v. City of Waco, is that you can just take literature and keep walking. That's what the court said in Ward. That's what the court said in United States v. Grayson. I'll give you that one person. If the city just for whatever reason wanted to exempt your client but nobody else, others might complain, but that's—others might complain that they don't get to do it, but one person is not necessarily a danger. I take it the city's concern is that how can they exempt you but not others, not you, but your client? They haven't stated that, but I do think— But your point is you could have lots of people leafletting, and that would just not be a problem? Just the math of it, Judge, if one person causes zero stoppage, 15 people cause zero stoppage. And so it really doesn't matter if there happens to be one or 15 people who are handing out literature in that same area. You're talking about 300 or 400 feet. A person could take 15 pamphlets and keep walking and not stop once. And so it's not necessarily prone to do that. And I believe that's what the cases state, Your Honor. And so with that, so it's not nearly tailored in a sense. What case are you most referring to when you say that leafletting is literally zero? That is—that was not something that was briefed. That was not brought up by the city or the lower courts. I'm just—I'm just—you said there are authorities that say leafletting is per se zero or hundreds of people won't have an impact. The case I would rely to is that's not cited in the materials, Judge, is Syag v. City of Dearborn. It's a Sixth Circuit decision, and it dealt with that issue, wherein that issue there's a question about congestion and— Spell Syag for me. It is Syag. Yes, Your Honor. Spell that for me. Syag, S-A-I-E-G, if I'm pronouncing it correctly. And it's—what happened, that dealt with a festival area, and there's a question about congestion and whether or not they could leaflet. And that same argument was brought up. Well, maybe not just one, but if you had multiple people handing out leaflets, wouldn't that cause an issue? And the court there held no, it would not, because it doesn't really compute that if you have an activity that doesn't cause stoppage, that if you have multiple instances of the same activity, that it would cause stoppage. Does the record show that your client agreed to dispense with the oral preaching and just to hand out the leaflets and so forth? Yes, Your Honor. Time holding. It does say. The record does support that. The record excerpts is probably the clearest evidence as record excerpts in page 54. That's a second letter from Mr. Harris. He sent a letter saying he wanted to be able to speak, and he asked for relief from this restriction that the city was applying in this area. And the city wrote back that no, it really couldn't do that because they had a policy that had concerns about obstruction. So he wrote a second letter. And what he did in the second letter is he explained, all I want to do is hand out literature or hold a sign and do it in the grassy curtilage. So he made it perfectly plain. The district court didn't make that distinction, did it? No, Your Honor. It did not seem to incorporate preaching, delivering a sermon as part of his speech, when in fact that's not what he intends to do in that area. And for that reason, I believe what the record demonstrates is that it's not nearly tailored to a significant government interest. And also another issue from a free speech standpoint is that- Do you have a citation for that case? Sorry to go back, but the Sixth Circuit case you're referring to? I'm sorry. I do not, Judge. It was not cited in materials, and that's an oversight on my part, and I apologize for that. That was not something that was briefed in the court below. Do you understand what I'm asking? It seems extremely counterintuitive that it doesn't matter how many people are physically in a space. It's not going to obstruct an area where thousands of people are trying to get in and out of an event. Well, if you consider if it has the same effect, which courts have stated, Judge, as you're standing there. Okay, so if you have one person standing in that grassy curtilage, that's not going to cause an obstruction. If you have five people standing in a grassy curtilage, that doesn't cause an obstruction. If you have 30 people standing in a grassy curtilage, that doesn't cause an obstruction. So that's really kind of the logic. Pedestrians are walking through the grassy curtilage? Is that what you're saying? I don't know how it could- Sure, sure. If one person stands in that door, that's an obstruction. It is. But if 15 stand in the door, that's a bigger obstruction. Oh, it's a blockade. There's no question about it. And I think that's an important point of distinction here, Judge, is that the grassy curtilage is not a walkway. You already have trees and poles. Well, he wants to leaflet and not talk. He's got to be close enough to someone to hand them something. He does. So either they're walking in the grassy curtilage or he's walking off it to get to the passersby. Not necessarily, Judge. And the reason is is because he's in the grassy curtilage and the sidewalk is right here. So he is handing it to people as they are walking by. And also, of course, with the sign, he's just standing there and just holding it. I'm assuming the idea is in these major events there are people walking on the grass too. They're just trying to get- No, there's no record support for that. In fact, it would indicate- Oh, just common sense. It would indicate otherwise, and I'll tell you why. It is because where the people are coming from, Judge, there's absolutely no reason to walk in the grass. They're coming from the eastern direction, and they would just walk on the sidewalk. And you have a grassy curtilage that is littered with trees and poles, so there's really no reason when you're trying to walk due west, there's no reason to walk in the grassy curtilage because you'd have to walk around those trees and poles. What you would do, actually, and what it shows is that you'd walk on a sidewalk. And so, no, there's no one, and actually there's either from a factual standpoint or a logical standpoint that people would walk in a grassy curtilage. Then also there's an issue with whether it leaves ample alternative channels of communication. And this is an issue because what the city is proposing an alternative is for him to go across the street. And that logistical issue is problematic because all the designated parking spots for the event are located south of the intersection such that no one from those designated parking lots walk on the other side of the street. They all walk on the side of the street, the southwestern part, where Mr. Harish wants to be. So that eliminates, effectively, his audience to be able to receive his literature and to be able to read his sign. You only brought a free speech First Amendment claim, right? You did not bring a free exercise? Did not bring a free exercise, no, Your Honor. But we did bring a due process claim as well. The reason I mention this is I do have this concern about if you let one person speak, you need to let other people speak. A free exercise claim at least would, I'm not saying it would win or lose, but at least it would be specific to your situation. Sure. No, that claim was not brought, except to the extent it would be incorporated in free speech. Now, he does seek a claim as far as religious speech, but he does not, Your Honor. You see, my point is you're not asking, you could have asked for a religious accommodation. I don't know in this context, in a public forum, I'm not aware of a religious accommodation. Well, the idea would be this is, you know, I thought you might mention Employment Division v. Smith, but the idea would be you've got a rule that substantially burdens religious exercise and you want an accommodation. Think RFRA and RLUPA and that sort of thing. But it sounds like you've not made that argument. No, Your Honor. We have not made that argument. Really just relying on basic free speech principles as well as due process where you have a— But the problem with analysis—sorry. In connection with your due process claims, you say that's because the organized activities policy is unconstitutionally veiled. Is that your claim? It is, Your Honor, yes. But there's no criminal sanction connected to the policy. Isn't that correct? Not directly, but it certainly is effectively and practically because the police officer, on the basis of that policy, orders Mr. Harris to move, and if he doesn't move, he gets arrested. So there certainly is a criminal sanction that's tied with it, and he's asked to move on that basis. And also the law— But when you read the policy, the policy doesn't say anything about criminal sanction, does it? That's part of the problem, Judge. There is no policy to read. It's unwritten. So it's constitutionally vague because it doesn't say anything about you being sanctioned or criminally charged. All Mr. Harris knows is that he either has to stop leafletting, he has to stop holding a sign, and if he doesn't do so, then he's subject to criminal sanction. But as a practical matter, all he was asked to do was cross the street, and he could do everything he wanted to do right across the street. Isn't that right? He was ordered to move, and if a police officer orders me to move, I'm moving because I do not want the consequences. I'm past that. I'm just saying the only thing he was asked to do was go across the street and do everything he wanted to do. He wasn't asked. He was ordered. All right. And I think if you review the DVD that's set out in a record on 461— I watched it. I think that's— Now tell me what about that should trouble me. That he ordered him to move, and I don't think staying there was an option, Judge, or— Nobody's claiming it was an option. I don't really understand. I'm sorry, what's that? I don't understand that argument. Their defense is not it was your choice. Their defense is that they're allowed to order you.  All right. And so also dealing with this, another issue that's been raised is whether Montgomery County is responsible, and I believe what the record shows is that they are because this is a policy that applies uniquely to Montgomery County property, is enforced by Montgomery County agents, and by their response letters, Montgomery County approved and ratified this policy. In these letters, they state they have an interest in the policy. They state that they will not make an exception for Mr. Heritage under the policy, and they state that he—and they warn him not to violate this policy. So the county is intertwined. They are responsible for the policy and should be held accountable for those actions. Also, Officer Williams as well, because in light of the authority of United States v. Grayson, particularly Knowles— I think Knowles is a case that has much bearing on this one— that the idea that you can ban leafletting, ban— of course, that same issue could have been brought up with Knowles as well, Judge, about aggregate, but that wasn't part of the issue because all they were doing there was just leafletting and holding signs. And so the—but if you do that, as Officer Williams did, in contravention of constitutional principles, then you should be held responsible as well. So— What's the distance between where he wanted to stand and where he was ordered to stand? It was across—he was ordered to go—had a corner across the street, if I was to guess, 100 feet, 150 feet. I'm not really sure of the exact distance. For him, the problem was traffic flow. Where's the traffic going? He's going from a place where he could reach people to a place he could not. Thank you, Your Honors. Thank you, Counsel. Mr. Griffin? Yes, Your Honor. May it please the Court. I am B.D. Griffin. I'm the county attorney for Montgomery County, Texas. I will be speaking today on behalf of Montgomery County and Jimmy Williams. Mr. Adam Anderson, assistant county attorney, will also be speaking on this behalf—on their behalf. What I would like to address specifically is a few things. Can you give me a sense of how big this area is that people are walking through? Sure. It's about—it's about a block. The restricted area, the area that Mr. Herridge wants to be in, is the corner of a intersection of four streets, where he is said to be—where he was told to move across the street is across, basically, an intersection of city streets. What we're hearing today is that he's willing to be in the grass where nobody's supposed to walk anyway. So what's the big deal of just letting him be in the grass? Number one, the big deal is when you have as many people going through in these large concerts. The concert—he was back in May 18th. He did want to preach, but back in May 18th, it was a full-out crowd. I thought we heard this morning he was willing to merely leaflet and not to slow people down. Not on May 18th. That's not correct.  Are you saying that it would be okay for him to just leaflet and not speak? No, we're not saying that. I'm saying that's not what happened on May 18th. Okay. Well, let's move on. If you're saying you can't leaflet, what's the government interest if it's not going to be a big deal? Well, it's still a big deal because, again, when you have that concert—because what he calls the policy, I would call a procedure that Officer Williams developed for handling the traffic control and pedestrian control. It only affects when you have large concert, large venues. The Woodlands Pavilion— Again, what's the big deal of just letting them pass out? I mean, it's not going to slow anybody down. It does slow people. Based on what's in the record based on Officer Williams' experience, hundreds of people will go through that at the same time. The area is not—my recollection is it's not very wide, maybe five feet. Again, as Judge points out, you'd have to interact with people. You'd have to—and when you have that many people moving towards the entrance to the facility, they're not going to stay on the sidewalk, and there are not obstructions, so to speak, in that area. At least, I don't think there's anything in the record. There might be a pole within that stretch, but— In the area that people are ingressing and egressing, how wide is it? I would say there's nothing in the record. From my recollection, it would be about 10 feet total, about six feet, three feet for the sidewalk. There's an area between the sidewalk and the actual roadway, which would be in the county right-of-way, and then past the sidewalk— Ten feet where they can walk, and then additional grass beyond that? I don't think there's much grass beyond that. Ten feet total? Ten to 15 feet, I would guess. Again, I didn't go out and measure, and there's nothing in the record to show that. Is there car—automobile traffic through that intersection at the same time? Very, very heavy traffic. When people are arriving at concerts, they're being dropped off. There's parking lots.  Because if he is forced to go to the other side, people on the side he wants to be on are obstructed by heavy traffic. Well, yes. In fact, what they do there—I wonder if they don't want people in that area doing anything— is because they will stop traffic and move people in mass through that intersection, both from the north and the south, both from the north and from the west, I believe, to move through that intersection, and they are going to one of the three entrances to the Woodlands Pavilion. Now, there are parking lots to the south there, which some people park in, but there's also a south entrance. There's also an east entrance that is south of the location which Mr. Harrods wants to locate. One of the largest parking lots that people use is to the north and right next to where he was told he should move, and that's the Woodlands Mall parking lot. There's a large parking lot adjacent to the Woodlands Mall. Many people, especially when you have a large concert venue, a large—this was a ZZ— on May 18th, a ZZ Top sold out 16,000 people. The time in the record where he reflects, well, nobody's coming from that parking lot, was a smaller concert, 3,500 people. So there was not as much overflow traffic and people coming from that area. So it is a highly congested area, especially at the time when people are going to the concert and trying to get into the concert. They queue up in front of the north entrance, further down the street, but still on, I believe, Lake Robbins. Just to clarify, because what I heard was there aren't any pedestrians on the side he was ordered to move to. But what you're telling me is the record reflects that there is pedestrian traffic on that side of the intersection, particularly when there are large concerts. Yes, and that is in Mr. Williams' both affidavit and his deposition testimony. Like I said, this was—if you go to May 18th, this was a sold-out. 16,000 people were going to go into the— ZZ Top. ZZ Top. Houston, Texas, ZZ Top. Yes, and it's like any other big concert. A lot of people come at the same time, so you have a whole mass of people moving through. Would it be reasonable to say that letting one person leaflet, not to stop anybody but literally just to hand out, that's not a big deal? The problem is if you let one person do it, you've got to let lots of people do it. Is that the problem? That's certainly a problem, especially in this instance. I take it you've had other requests or— What? It doesn't matter. I'm just curious. Have you had other requests? We're not aware of any other requests because we're not aware that this was what was being done. It goes back to—he says it's county policy. Jimmy Williams is the fire marshal for Montgomery County. He wasn't working as the fire marshal then. He was working as off-duty police, helping crowd control for the Woodlands Pavilion for concerts. He's been doing this for a long time. But this was the first, to my knowledge, that the county has ever known where there's been any complaint about this. But the point is one person asked. Yes. And the concern was not the one person. But gosh, if you let one person speak, and that's sort of First Amendment free speech, right? Correct. Vendors, commercial vendors are going to come in. That's the problem. In the record, Mr. Williams has testified, in the past we've had people try to solicit things or sell things, play guitar there, do whatever. I think even Mr. Herridge indicates this is content neutral. There's no question that it's content neutral. I just want to be clear. You're not conceding that a single person in that area wouldn't be a problem at all. No. You're not conceding. No. What you're saying is the more the worse. But you're not conceding that one person couldn't be an obstruction problem. Correct. I think the thing about that is they only implement this procedure, this policy, when they expect the crowd to be large. If it is the Alice Cooper concert, I think that Mr. Williams referenced, 3,500, he could stand wherever he wanted to at that point. It is the size of the crowd and the fact that the experience has shown that there's this mass of people moving about at the same time. They're having to stop traffic lights, move people in mass across that intersection and move them to this one place. So, again, people are coming from north and south. In a smaller attendance, he's not exposing his message to many people. I'm sorry, say again. He's not exposing his message or his handouts to nearly as many people if you let him do it only on the smaller ones. Well, but that's just because he chooses to come to the small ones and he can get everyone who passes through either intersection. He can decide, well, a few more people are coming from that parking lot, so I'm going to go to that parking lot or to that side of the intersection. Again, this policy is just when you have this mass of people moving through, 7,500 or more people, is I think what Mr. Williams testified to. And there's no exact number, and it is really prior to any type of enforcement of the 4203 of the obstruction law. So, yes, we feel leafletting would be a problem for two reasons. One, because it is limited to large concerts and there's just not that much room for hundreds of people to be going through at one time. And the exclusivity, he wants an exception to the policy. You grant him an exception, you have to grant someone an exception, especially for us to try. If you're limited to a content-based exception, that would be difficult. Again, it goes also to redressability. The county, this is not a city. This is an unincorporated area of the county, though it's very dense. We're very strange in that regard. Williams is a strange creature. And so you have all these off-duty police officers from jurisdictions, not only Montgomery County and not only county constables, but school districts. You even have Harris County officers working part-time security there. So, you know, we can't grant the exception. We can't say, oh, well, y'all don't do this. You let Mr. Harrods speak whenever and wherever he wants. How are we going to enforce that if this court were to say, yes, Montgomery County, you're responsible, so you need to, in the future, you need to make sure that he can do this. We just don't have the capability to enforce it. And that's really the redressability argument. Mr. Griffin, your time has expired. Thank you.  Mr. Anderson. Thank you, Your Honor. May it please the court. My name is Adam Anderson, and as Mr. Griffin introduced me, I'm also here on behalf of Montgomery County and Mr. Williams. I want to jump right into Judge Ho's position, or at least what you had asked about one individual versus more than one being able to conduct such as leafleting. And the Supreme Court in the Heffron case actually addressed that. They looked at it and said we can't – the Heffron case was a case where you had a religious organization that wanted to go around and actually sell wares and to hand out items of their religion. And the court said in this instance we can't only look at whether or not they're causing an obstruction or not. We would have to look at every other organization because they have no higher – they have no higher ability to be able to be in that area versus any other group. And that's what we have here. If an exception, which is what Mr. Herridge asked for, was provided, it would have to be content-based, which is the exact opposite of what this policy is. Just to be clear, I think that's the point I was trying to make. I believe so, Your Honor. I understand the city's position. I'm just trying to make sure I understand it. One person, fine, that's not a big deal. The problem is how do you favor one person and not let anybody else in? Is that – I'm just trying to understand your argument, your best argument. I'll argue on that. In this particular instance – Because I get that one person is not a big deal. Multiple people, it would be a huge deal. That sounds reasonable to me. Is that your point or is it a different point? That is not our point today, Your Honor. The record does show that the activities that Mr. Herridge wanted to conduct would have caused an obstruction in this particular area. I would note that – But he wanted to speak and – because I think he said he's going to just leave. Your Honor, and as the district court analyzed this, they looked at – the district judge looked at speech, looked at leafleting, looked at signage. All of them were encompassed whenever it was determined that that – any of those activities would cause an obstruction in the area that Mr. Herridge wants to stand and conduct it, which is in the grassy area. Once again, there was some discussion about whether or not people are crossing that. Absolutely people are crossing that. At the other locations where people are being massed, there's at times hundreds if not thousands of people that are grouped together. How many police officers are on site or officers on site? I believe at the largest event they can have up to 40 officers – 40 off-duty peace officers that are usually hired by the Cynthia Woods Mitchell Pavilion. If somebody needs to – let's say somebody's out there waiting to meet a friend while people are ingressing or egressing. Any policy as to that person? If that person was standing in this particular area and was causing people to back out into the street or into the roadway, they would absolutely be asked to move. There's no question – I mean, once again – Is that in the record? It's in the record that, yes, any activity for any individual, whether it's an organized organization or it's an individual, if they are conducting any activity that could cause an obstruction or cause people to back into the street, that's what we're looking at. The obstruction is not just crowdforming, it's people. Do you have a record site? I just want to see this. Yes, Judge, and you're saying specifically for individual? My hypothetical is an individual who's literally just standing there in the same area but waiting to meet a friend. And I apologize, Judge, I don't know if that exact scenario was played out. Something like that. The policy position of Jimmy Williams was if he sees any individual – and this is in the deposition, and I can follow up with the court to give the exact sites, and I have it with me. I don't want to take too much time looking through it. But the specific was whether it's an organized activity or an individual activity that is causing an obstruction. And the key here is the obstruction being caused. Now, it didn't go into any of the other activities. What if they're not obstructing? They don't have stuff with them. It's just one person literally on their phone waiting to meet their friend. If their activity is not determined to be causing an obstruction, they wouldn't fall into this policy. Okay, so that's my point. One person is not a big deal. It was determined – and I agree, Your Honor. It's the problem of if you get speech, then everybody gets speech, and now I've got a real problem. That's correct. And I would once again fall back to the Heffron case in which case that was a similar argument made by the Christians when they said we're not causing an obstruction. And the court said we can't analyze this solely based on whether you're going to cause an obstruction. I guess my problem is that one person can't be a big – if one person is Brad Pitt, that could be a big deal. Absolutely, Your Honor. And the record does show that Mr. Heffron, Mr. Herridge's activity has caused people to slow down even across the way. They slow down. When he's handing out, they're stopping and taking it. And in the short period of time we're at a crowd of 16,000 people entering a venue, people slowing down, that's going to cause a logjam effect out into the road. Well, if he had wanted to hand out his leaflets at the one gate where they were taking tickets, he obviously couldn't do that. That would be correct, Your Honor. That would actually be on the – you're talking about on the pavilion property, so it would be out of the right-of-way. What we're discussing is in the right-of-way. But what I'm talking about is causing an obstruction, and you're saying he causes an obstruction where he wanted to be, and I'm saying that's indistinguishable from the ticket gate. Well, I guess I would be looking at what the state's interest is here. It's a friendly question. It is, Your Honor. Yes, I'm just trying to see – yes, absolutely, that would cause an obstruction there. What we're looking at, obviously there's heavy trafficking vehicles out on the road, and that's where they're walking down this very narrow sidewalk to try to get into the venue. So if he was causing obstruction at that area versus even, say, on the pavilion property up in front, you may even have a different – And that's not county property, is it? That is not county property, Your Honor. With that, Your Honor, I would also look at – looking directly at the narrowly tailoring, this policy is narrowly tailored to restrict it to that area. I want to – I would point the court to the record on 478, and that's the map provided by the county to Mr. Harridge's attorney that identified with red circles the restricted area and green the – not permissible, but the areas that he would recommend him to go to because that's where everybody's going to be gathering together to cross over. So when we're looking at the actual restriction on location, it's one side of one block of one street during a very limited number of concert venues, and those are going to be the largest venues held at that event. Over 7,500 people, and specifically on the date in question it was 16,000 that were going to be coming in. So the distinction would be at a smaller event such as – they have range from 500 to 16,000. At a smaller event, they won't have officers stationed at that intersection. There won't be any need to be out there. The record does state if any person, whether they're selling CDs or whatever, are in that area causing an obstruction, causing people to have to walk into the road, they're obviously going to be asked to move. But that doesn't – that's not under the policy even at that point. It would be under an obstruction of a sidewalk under 4203. So this policy is only in effect at a very limited time, and it only is going to affect activities that are going to cause or are being deemed to cause people to – That's when he most wants to be there is when there's a big – Yes, so him and 16,000 other people, Your Honor, they all want to be there and they all want to cross through this one spot, and that's the dynamic that we're working. And that's why the courts – the Supreme Court hasn't stated that he gets to be anywhere he wants, wherever he wants to do it, however he wants. It allows for the state to institute limited restrictions that are narrowly tailored to – that serve a significant governmental interest and provide ample alternatives of communication. And that's exactly what this policy does. It provides him to go stand on the corners where everybody's grouping up to cross over to come into the venue. And at the largest venues, the lots that he's going to be standing in front of are going to be full of people. The record cites that Jimmy Williams, who's been out there for over a decade, he cites that that's – he's been there long enough to know that's where the people are coming from, and that's why he made the recommendation. Secondly, we would look at – particularly for Jimmy Williams, qualified immunity is going to apply for him in this case. Nobody's arguing that he wasn't operating under the color of law, and counsel hasn't cited any cases that would have put Mr. Williams on notice that asking him to cross the street and to not cause an obstruction to preach would have been a constitutional violation. So we would – we believe that nonetheless it's not a constitutional violation, but if the court did determine that so, it's definitely not clearly established, as it was – as the district court seemed to reason and the counsel for Mr. Williams at the time reasoned. Not that that's authority, but there are – there was no case cited specifically for preaching especially that would have put Mr. Williams on notice that he would not – Is there a distinction between preaching and handing out leaflets when it comes to obstruction? If – I don't believe that we've – I don't believe the record shows that there's any evidence to show a distinction between the two. More cases were cited by Mr. Heritage's attorney for the – for leafleting and for signage. He didn't cite any cases for preaching. So – but specifically on the 18th, he was there to preach. That's what he said. He said, I want to orally broadcast my message. I don't know how many other ways I can read that. And obviously he told Mr. Williams when he – in his deposition he stated, when you went there, were you there to preach? He said, I absolutely was. So that was the activity that was specifically being cited. However, whether it's sign holding or whether it has to do with leafleting, we would say all those activities are equally going to be obstructed in this very, very limited area at this very limited time due to the crowds that are coming in. With that, Your Honor, if you have no further questions, thank you. Thank you, Counsel. Rebuttal. Thank you, Your Honor. Briefly, if you take a look at the record excerpts on pages 40 and 41, it shows two photographs of the area. And what it shows is it's a pretty wide area where you have about 10 feet of grass and then also you have about 10 feet of sidewalk. And what we're talking about is the ability to be able to stand – I'm sorry, where are you directing us to? Record excerpts on pages 40 and 41. And in this area, I think what it vividly demonstrates is you can stand in this grassy curtilage without obstructing any traffic whatsoever. And I think what's really important to point out about this restriction is it's on organized activities. So you could have 50 people stand in that grassy curtilage. It's not against loitering. You can stand in that grassy curtilage. If your activity isn't organized, you can stand there. So you can stand there and you can talk on the cell phone. You can wait on your one person who's late for the concert, all 50 of you, and there's no issue. But if you hold up a – You say there's no issue. You're not suggesting that the law enforcement officer couldn't determine that that presence constitutes an obstruction and then, according to you, order the person to leave. Well, that would be a separate – it's not an organized activity. So it doesn't fall within what they say they try to restrict there. Now, they will restrict if it actually does cause an obstruction. Sure, they will. Or they will restrict it if it's an organized activity. That's their policy, and that's what they enforce. And so – but if you just stand there – They don't agree that it's something called policy, but that's what you call it. They don't agree with the moniker, but that's what the policy is. I mean, they state that's exactly what – I mean, that's how they describe the policy themselves, is that they eliminate organized activities. And so the – and so if you're standing there – and this is where, Judge, I think it gets important to aggregate. You have 50 people standing there, and it's not an issue. You hold up a sign. One person hold up a sign. Well, then that's when it violates the policy. So just standing there in this grassy curblidge, out of the way, holding a sign, even if you have one or 50 people, it really doesn't obstruct because people can see it and keep walking. And I believe also the cases say that even if you're leafletting, because it does require someone to take a pamphlet out of someone's hand, but what the cases have said is that you don't have to stop to do it. So that in and of itself doesn't cause issues either. What's your best case? The best case is United States v. Grace. United States v. Coquinda makes that same statement about someone can take a pamphlet out of your hand without stopping. SAIEG is very good on the aggregate issue. And if you compare it to, like, the Heffron case, which opposing counsel cited, is that that's inapplicable because in that case people were allowed to go outside the event. They were allowed to go to the public way outside the event, and that's exactly what Mr. Harris seeks to do here. So thank you. I appreciate your help. Thank you, counsel. The court will take this matter under advisement. This concludes those matters which are on the docket for oral argument today. And so we are adjourned until 9 o'clock tomorrow morning. Thank you.